LEMMON, Judge.
Louisiana Gas Service Company instituted this action against Lumber Importers’ Service Corporation to collect the balance due on a promissory note executed in connection with the construction of an extension of a gas line to the defendant’s plant in St. Bernard Parish. Lumber Importers answered and reconvened for dam *476 ages occasioned by plaintiff’s unreasonable and negligent delay in supplying gas service. Lumber Importers also filed a third party petition against Cargill, Inc., another customer of Louisiana Gas subsequently served off the line in question, asserting that Cargill was liable for part of the principal demand. Cargill, Inc. filed an exception of no cause of action to the third party petition, which was maintained by the trial court. No appeal was taken from the judgment dismissing Cargill from the suit.
After a trial on the merits, judgment was rendered in favor of Louisiana Gas, awarding the balance due on the promissory note on the main demand and dismissing the reconventional demancj. Lumber Importers appealed suspensively.
In May, 1962 Lumber Importers decided to construct a lumber drying'kiln on a parcel of land owned by Southern Railway Company located on the Chalmette slip on the Mississippi River. Pursuant to this decision Louis Kerkhoff, president of Lumber Importers, contacted Louisiana Gas about furnishing natural gas to the proposed plant. When representatives of Louisiana Gas accompanied Kerkhoff to examine the location of the proposed plant, one party recalled the existence of an abandoned three inch gas line in the vicinity, which had been constructed during World War II across the property of the American Sugar Company to service the Port of Embarkation. The representatives indicated to Kerkhoff that they would explore the possibility of utilizing this line to service the proposed plant and that they were interested in furnishing natural gas for the operation.
Lumber Importers ordered the kiln with a burner designed for using natural gas and started construction of the plant in July, 1962. In the meantime Louisiana Gas obtained data from old files, showing the location of the line across the American Sugar property, and secured permission from that company to locate and test the line. However, difficulty was encountered first in physically locating the line and thereafter because of damage to a section of the line. The company repaired a portion of the damaged section in order to run tests and found that the line would be satisfactory if extensive repairs to the damaged section were completed. Thereupon Louisiana Gas began negotiations with American Sugar for a servitude for operation of the gas line in that location, since the previous servitude had been extinguished. American Sugar refused to sign the standard form agreement and eventually submitted a servitude agreement drafted by their own attorneys which stipulated that Louisiana Gas would be responsible for any damage to persons or property regardless of fault and that the line would have to be relocated upon 30 days notice by American Sugar. Louisiana Gas refused to accept this servitude with these onerous stipulations, and the negotiations broke off in the early part of 1963.
Meanwhile, Lumber Importers had completed construction of the kiln in October, 1962 and was in dire need of natural gas or some form of fuel for the operation of its plant. When it became apparent that serious difficulties were being encountered in obtaining the servitude necessary to use the line on American Sugar property, Lumber Importers converted the burner to allow use of propane fuel and commenced plant operation on February 4, 1963.
After negotiations with American Sugar failed, Louisiana Gas made a survey of alternate routes. Since the plant site was surrounded by private property, acquisition of a servitude was necessary for any route chosen. Construction of the line along the Mississippi River levee in the vicinity of Chalmette National Park presented the shortest and least expensive alternative for extending service from any existing line. Permission for the extension was sought from the Department of the Interior and the Levee Board and was obtained from the Federal agency, but this route was finally abandoned when the Corps of Engineers and the Department of Public Works *477 refused to allow the line to cross the levee. There was some testimony that another route was considered but determined to be unfeasible.
Louisiana Gas had also considered extension of an existing four inch gas line on St. Bernard Highway, but this extension was clearly the longest route and the most difficult to construct, since it involved crossing the highway and seven railroad tracks. When the company was unable to obtain a servitude across the other alternative locations, it was decided to attempt to utilize this route, which involved construction of the entire line on the property of Southern Railway Company, lessor of defendant’s plant site. Southern agreed to allow construction of the line, but objected to a route directly from the highway to the plant. Approval was finally obtained in July or August 1963 for a route along a service road across the property, which entailed construction of a line about 3,000 feet long. A permit was also obtained from the Department of Highways.
The gas company prepared estimates of costs and revenues and approached Lumber Importers about sharing in the cost of construction of the line. The usual procedure followed in extending existing lines to serve residential customers was to charge $1.00 per foot for an extension in excess of 100 feet. Louisiana Gas proposed to furnish service to Lumber Importers, which was classified as a large industrial customer, on the same basis, although the testimony is confusing as to any policy or precedent in the district for sharing the cost of construction with this type of customer.[1] Since Lumber Importers was short of cash, the gas company agreed to accept the sum of $3,000.00 in 12 monthly installments of $250.00 each. Kerkhoff testified that he agreed to this because the cost of propane exceeded the cost of natural gas by three or four times, and his company would save more than the amount of each monthly installment by using natural gas. The Gas Service Agreement and the promissory note herein sued upon were both executed on October 24, 1963, and construction of the line was commenced shortly thereafter. The line was completed on December 5, 1963 and natural gas furnished to the kiln on the following day.
Lumber Importers timely paid five installments on the promissory note, but refused to pay any further installments after Cargill, Inc. was allowed to tie into the gas line without being compelled to reimburse Lumber Importers for any part of its contribution to the cost of construction.
The main line involved in this litigation was constructed perpendicular to the highway. Cargill tied into the main line at a right angle thereto at a point approximately 2,400 feet from the highway and 600 feet from the river. The extension off the main line to the Cargill plant was a two inch line, which was apparently built along another service road, and ran for a lineal distance of 1,225 feet. Cargill paid $1,125.00 toward the cost of extending this service line, but made no contribution whatsoever to the cost of previously constructing the main line, of which it utilized the first 2,400 feet.
Lumber Importers resists payment on the promissory note on the basis that 19 months elapsed from the date of the initial inquiry until service was furnished, during which time its business was almost ruined, and it was in no position to exercise freedom of consent when plaintiff demanded a $3,000.00 contribution toward construction of the line. It is further contended that Kerkhoff, being called upon to pay for a line which was later used to serve other customers, was operating under an error of fact which vitiated the contract.
*478 As to the alleged error of fact, Kerkhoff testified that he explicitly understood the line was being constructed for his company and no one else. However, the manager of the gas company testified that the three inch main line, rather than a two inch line necessary for serving this particular customer, was constructed in anticipation of obtaining other customers.
It is important to note that Lumber Importers did not pay the entire construction cost of the three inch main line, but paid only $3,000.00 of the total cost of $11,321.-00. Perhaps Louisiana Gas might have scored higher in the public relations department by attempting to have Cargill contribute to the cost of the 2,400 feet in dispute or reimburse Lumber Importers part of its contribution, but we fail to see how this relates to the merits of this suit. There was no contention that Louisiana Gas agreed to reimburse any part of this contribution if and when other customers tied into the line (although the evidence shows that this was normally done with residential customers), and we have not been shown any legal basis upon which this court could order reimbursement. Certainly, the exclusive use of the line was not a primary consideration for Kerkhoff’s execution of the note nor did he show that his corporation was hurt in any manner by other customers being served off of the line. Furthermore, Cargill was required to contribute to the cost of its extension on the same basis of $1.00 per foot for the distance in excess of 100 feet from the closest existing line.[2]
As to any economic duress, Kerkhoff willingly agreed to contribute $3,000.00 toward the cost of construction and negotiated for installment payments. There was no showing that Louisiana Gas purposely delayed service in order to induce Lumber Importers to make this contribution. Kerk-hoff’s statement that “had the gas company not served Cargill from this line (I) would not have complained” discloses the true reason why the note was not paid as agreed. We conclude that the trial court was correct in rejecting Lumber Importers’ affirmative defenses to the principal demand.
The reconventional demand for damages is based on the alleged unreasonable and negligent delay by Louisiana Gas in furnishing gas after being obligated to provide service, and Lumber Importers failed to bear the burden of proof in this respect.
The gas company contends that it was not obligated to provide service until October 24, 1963 when it signed the Gas Service Agreement providing for service before December 1, 1963, and that service provided on December 6, 1963 did not constitute an unreasonable delay. On the other hand, Lumber Importers contends that the gas company verbally agreed in May, 1962 to provide service “on very short notice” and also was contractually obligated under its franchise to provide service within a reasonable time.
There was a dispute of fact on the alleged verbal contract. Since the trial court ruled against Lumber Importers, there was apparently a factual finding that the gas company did not enter into a verbal contract for service within a few days of notice, and we find no manifest error in this determination.
As to a contractual obligation under its franchise, we are not cited any authority which requires a public utility to extend service to an industrial customer. Situations can be visualized where the reasonableness of the demand for service must be measured against the circumstances involved, even with a residential customer and certainly in complex situations involving large industrial consumers. However, *479 assuming without deciding that Louisiana Gas was obligated to provide service in this case, there is no showing that service was ever refused. The key issue here is whether the gas company made reasonable efforts to utilize existing facilities or to construct additional facilities for furnishing service after indicating to defendant that it was willing to provide this service.
Since the plant was surrounded by private property, it was necessary to acquire a servitude before service could be commenced. It was a reasonable decision to attempt to use the existing line, and substantial efforts were made in this direction. Kerkhoff attempted to assist by having his representative contact American Sugar’s New York office. While an exceptionally long period of time was expended in attempting to secure use of this existing line (which was obviously to everyone’s benefit), negotiations regarding servitudes do not generally proceed with dispatch, especially when national corporations and governmental agencies are involved. It was Lumber Importers’ burden to prove that the gas company acted unreasonably or negligently, and no evidence was presented to show that Louisiana Gas did not use reasonable diligence in negotiating with American Sugar or that Louisiana Gas should have realized at an earlier date that an acceptable agreement with American Sugar would never be forthcoming.
Furthermore, we do not believe that it was unreasonable for the utility company to attempt to negotiate agreements on alternative routes rather than to resort to expropriation of a servitude over the American Sugar property with the attendant delays involved in litigation.
When efforts to use the existing line proved fruitless, it was reasonable to next choose the shortest and least expensive route, especially when the route eventually utilized presented difficult construction problems. While in retrospect it may be said that it would have been better for Louisiana Gas to have built the line in the beginning where it eventually did, we cannot say that it was unreasonable to pursue the other alternative first.
In our opinion the major cause of delay in this case was the fact of life in any business which requires servitudes for extension of facilities that serious negotiations for a servitude can only be conducted on one route at a time and construction cannot even be planned until a servitude is committed. Even after Southern agreed in July to the route eventually used, it was necessary to plan the engineering and construction and to obtain permits for crossing the St. Bernard Highway and the seven sets of railroad tracks. It was only after all of this was completed that the contract was signed in October. While a period from the beginning of 1963 (when negotiations with American Sugar broke off) until October, 1963 (when the service agreement was signed) is an unusually long period of time for a customer to wait before gas service could be definitely committed and construction of the line begun, there were unusual circumstances in this case. Perhaps in another case even a much shorter period would be unreasonable, but this type of case must be decided on the particular facts and circumstances involved. We conclude that Lumber Importers has not proved that the gas company did not make reasonable efforts to overcome the difficult circumstances presented in this case, which were not under the exclusive control of any party to this litigation.
For these reasons, the judgment of the trial court is affirmed.
Affirmed.

. The Public Service Commission, which then had jurisdiction over gas service to this type of customer, was aware of this arrangement and lodged no objections.

. It is significant to note again that the Public Service Commission was called into tiie ease when the $3,000.00 contribution was requested, and while no formal complaint was made, the Commission was aware of the contribution and the arrangements and did not intercede but acted only as mediator.